JS 44 (Rev 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CertainTeed Corporation

**DEFENDANTS**

Ravago Americas LLC

**(b)** County of Residence of First Listed Plaintiff   Chester County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orange County, FL
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert L. Hickok
Pepper Hamilton LLP, 3000 Two Logan Square, 18th & Arch St.,
Philadelphia, PA 19103, (215) 981-4583

Attorneys *(If Known)*
Edward J. Kelbon, Jr.
Reger, Rizzo, Darnall LLP, Cira Center, 13th Floor, 2929 Arch St.,
Philadelphia, PA 19104, (215) 495-6500

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
Plaintiff

- ☐ 2  U.S. Government
Defendant

- ☐ 3  Federal Question
*(U.S. Government Not a Party)*

- ☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original
Proceeding

- ☐ 2  Removed from
State Court

- ☐ 3  Remanded from
Appellate Court

- ☐ 4  Reinstated or
Reopened

- ☐ 5  Transferred from
Another District
*(specify)*

- ☐ 6  Multidistrict
Litigation -
Transfer

- ☐ 8  Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)

Brief description of cause:
Breach of Contract

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S)
IF ANY

*(See instructions)*

JUDGE _____    DOCKET NUMBER _____

DATE
09/07/2017

SIGNATURE OF ATTORNEY OF RECORD

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 20 Moores Road, Malvern, PA 19355

Address of Defendant: 1900 Summit Tower Blvd, Suite 900, Orlando, FL 32810

Place of Accident, Incident or Transaction: Chester County, PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))            Yes☑  No☐

Does this case involve multidistrict litigation possibilities?            Yes☐  No☑

*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

    Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

    Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?            Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?

    Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _____Robert L. Hickok_____ , counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: ___September 7, 2017___  _____  PA 30101

Attorney-at-Law            Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: ___September 7, 2017___  _____  PA 30101

Attorney-at-Law            Attorney I.D.#

CIV. 609 (5/2012)

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 20 Moores Road, Malvern, PA 19355

Address of Defendant: 1900 Summit Tower Blvd, Suite 900, Orlando, FL 32810

Place of Accident, Incident or Transaction: Chester County, PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☑   No ☐

Does this case involve multidistrict litigation possibilities?    Yes ☐   No ☑

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?

   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?

   Yes ☐   No ☑

CIVIL. (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _____ Robert L. Hickok _____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: September 7, 2017 _____   PA 30101

Attorney-at-Law   Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: September 7, 2017 _____   PA 30101

Attorney-at-Law   Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| CERTAINTEED CORPORATION | : | CIVIL ACTION |
| v. | : | |
| RAVAGO AMERICAS LLC | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                           ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.  (X)

| September 7, 2017 | Robert L. Hickok | CertainTeed Corporation |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-981-4583 | 267-200-0746 | hickokr@pepperlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CERTAINTEED CORPORATION,          :

                    :

                 Plaintiff,    :    CIVIL ACTION No. _____

                    :

              v.              :

                    :

RAVAGO AMERICAS LLC,          :

                    :

                 Defendant.    :

### COMPLAINT

Plaintiff, CertainTeed Corporation ("CertainTeed"), by its undersigned attorneys, brings this action against Defendant, Ravago Americas LLC ("Ravago"), for breach of contract and, in support thereof, states as follows:

### Nature of the Action

1.      This action is for breaches of the contract between CertainTeed and Ravago based on Ravago's supply of non-conforming and defective materials to CertainTeed which caused excessive and/or uneven fading of CertainTeed's polypropylene siding (the "Siding"). As provided for pursuant to a written contract, CertainTeed seeks: (i) reimbursement from Ravago for all warranty payments it has made to consumers because of the Ravago supplied polypropylene compound (the "Compound"); (ii) damages for future warranty payments that CertainTeed will be required to make to consumers; (iii) damages resulting from lost sales and harm to CertainTeed's business reputation; (iv) CertainTeed's time and materials costs in producing the Siding containing the Compound; (v) CertainTeed's expenses incurred in processing warranty claims and investigating the defects in the Compound; (vi) compensatory damages for pre and post-judgment interest, attorneys' fees, and costs; and (vii) all other relief

that the Court deems just and proper.  A true and correct copy of the contract between the parties,
the Purchase Agreement and its addenda, redacted so as not to disclose confidential and
proprietary information (collectively, the "Agreement"), is attached hereto as Exhibit "A."

The Parties

2.      Plaintiff CertainTeed Corporation is a Delaware corporation with its
principal place of business at 20 Moores Road, Malvern, PA 19355.

3.      CertainTeed is a building products manufacturer, selling products such as
roofing, siding, fencing, decking, railing, trim, insulation, gypsum and ceilings.

4.      On information and belief, Defendant Ravago Americas LLC is a
Delaware limited liability company with its headquarters at 1900 Summit Tower Blvd., Suite
900, Orlando, FL 32810.

5.      Ravago is a polymer producing company that manufactures a wide range
of plastic and rubber materials.

Jurisdiction and Venue

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.
§ 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest,
attorneys' fees and costs, and plaintiff and defendant are citizens of different states.

7.      This Court has personal jurisdiction over Ravago and venue is proper in
this District because Ravago agreed that "any such dispute or claim not resolved through
mediation shall be decided exclusively in the courts of the Commonwealth of Pennsylvania
having jurisdiction thereof, including as may be appropriate, the federal district courts sitting in
Pennsylvania, and each party hereto hereby consents to the jurisdiction of such courts."  Ex. A,
Agreement § 10.

8.      Moreover, venue is proper in this District pursuant to 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events or omissions giving rise to this action

occurred in this District; or, alternatively, pursuant to 28 U.S.C. § 1391(b)(3), on information and

belief, because Ravago is subject to personal jurisdiction in this District.

Factual Background

9.      On or about May 10, 2004, CertainTeed and H. Muehlstein & Co., Inc., a

predecessor to Ravago, entered into a contract, pursuant to which Ravago agreed to supply, and

CertainTeed agreed to purchase the Compound that CertainTeed used to manufacture its Siding.

10.     The original term of the contract was from May 10, 2004 through May 31,

2007.  Ex. A, Agreement § 3.

11.     Ravago and CertainTeed extended the term on several occasions and the

term of the Agreement ultimately ran through December 31, 2011.  *See* Ex. A, Agreement at

Addendum B (extending the term through December 31, 2009), Addendum C (extending the

term through December 31, 2010), and Addendum D (extending the term through December 31,

2011).

12.     During this entire time period, May 10, 2004 through December 31, 2011,

Ravago was the "Primary Supplier" to CertainTeed for mineral filled polypropylene compound

in various colors.  *See* Ex. A, Agreement § 1.1.1 and pp. 13-16.  CertainTeed did not use

polypropylene compound from any other supplier for its Siding during this time period.

13.     Under Section 4.2.2 of the Agreement, Ravago provided a warranty to

CertainTeed that "the Products sold under this Agreement shall conform to the Specifications

and be free from defects in material and workmanship."  Ex. A, Agreement § 4.2.2.

14.     In the event that Ravago breached the warranty in Section 4.2.2 of the

Agreement, Ravago agreed at CertainTeed's option, *inter alia*, to "refund the purchase price for

-3-

the Products" and "reimburse [CertainTeed] for all of the following, if and to the extent incurred by [CertainTeed]: . . .(ii) [CertainTeed's] time and material costs in producing [CertainTeed's] products which contain non-conforming products; . . . and (iv) [CertainTeed's] actual costs in settling the portion of any warranty claim with respect to [CertainTeed's] products which is attributable to the non-conformity of the Products" sold by Ravago to CertainTeed. Ex. A, Agreement § 4.3.2.

      15.    During the time period from May 10, 2004 through December 31, 2011, however, Ravago began supplying CertainTeed with the Compound that was neither conforming nor free from defects in material and workmanship.

      16.    The Compound was manufactured in a manner that caused the Siding to unevenly and/or excessively fade when exposed to environmental conditions over a period of time.

      17.    During the period of time that Ravago supplied its non-conforming and defective Compound to CertainTeed, a substantial number of consumer warranty claims for uneven and/or excessive fading of the Siding were submitted to CertainTeed.

      18.    To date, CertainTeed has paid in excess of $1 million for warranty claims and such claims are expected to continue to grow as a result of the non-conforming and defective Compound because the fading generally occurs after the Siding has been installed and exposed to the environment for a number of years.

COUNT ONE
Breach of Contract - Warranty

      19.    CertainTeed incorporates by reference paragraphs 1 through 18, as if those averments were fully set forth herein.

20.     Ravago warranted that its "Products sold under th[e] Agreement shall . . .
conform to the Specifications." Ex. A, Agreement § 4.2.2.

21.     Ravago also warranted that its "Products sold under th[e] Agreement shall
. . . be free from defects in material and workmanship." Ex. A, Agreement § 4.2.2.

22.     Ravago's failure to supply Compound for the Siding that conformed to the
Specifications is a breach of the Agreement, and is without defense or justification.

23.     Ravago's failure to supply Compound for the Siding that was free from
defects in material and workmanship is a breach of the Agreement, and is without defense or
justification.

24.     In the event of a breach of warranty under § 4.2.2, Ravago agreed to
"refund the purchase price for the Products" and "reimburse [CertainTeed] for all of the
following, if and to the extent incurred by [CertainTeed]: . . . (ii) [CertainTeed's] time and
material costs in producing [CertainTeed's] products which contain non-conforming products; . .
and (iv) [CertainTeed's] actual costs in settling the portion of any warranty claim with respect to
[CertainTeed's] productions which is attributable to the non-conformity of the Products" sold by
Ravago to CertainTeed." Ex. A, Agreement § 4.3.2.

25.     Ravago has failed to refund the purchase price for the Products
(Compound) and reimburse CertainTeed as provided for under § 4.3.2 of the Agreement.

26.     As a direct result of Ravago's breach of the Agreement, CertainTeed has
suffered damages in excess of $1 million resulting from the investigation and payment of
warranty claims.

COUNT TWO
Breach of Contract - Indemnity

27.     CertainTeed incorporates by reference paragraphs 1 through 26, as if those averments were fully set forth herein.

28.     Ravago agreed to "indemnify, defend and hold harmless [CertainTeed] . . . from and against any claim, cause of action, loss, liability, damage, cost or expense (including, but not limited to, reasonable attorney's fees) . . . resulting from or incident to any products liability claim relating to the Products before they are incorporated into Buyer's products or at any time if the Products do not meet the Specifications, whether such claim is based upon strict liability, negligence, warranty or other theory." Ex. A, Agreement § 4.4.1.

29.     To date, CertainTeed has paid in excess of $1 million in customer warranty claims attributable to the Compound supplied by Ravago.  The amount of warranty claims will continue to grow as the Siding made with the Compound remains installed and exposed to the environmental conditions.

30.     CertainTeed has suffered damages for lost sales and harm to CertainTeed's business reputation and incurred expenses in settling warranty claims and investigating the defects in the Compound.

31.     Ravago's failure to indemnify CertainTeed for its damages under § 4.4.1 of the Agreement constitutes a breach of the Agreement.

Prayer for Relief

WHEREFORE, CertainTeed Corporation respectfully requests a judgment against Ravago Americas LLC as follows:

1.      judgment for breach of contract in the amount to be determined at trial that CertainTeed has paid to consumers for warranty claims relating to excessive and/or uneven fading of the Siding made with the Compound;

2.      judgment for breach of contract for future amounts that CertainTeed will pay to consumers for warranty claims relating to excessive and/or uneven fading of the Siding made with the Compound;

3.      judgment for lost sales and harm to business reputation, the amount to be determined at trial;

4.      judgment for CertainTeed's time and materials costs in producing the Siding containing the Compound;

5.      judgment for expenses incurred in processing warranty claims and investigating the defects in the Compound, the amount to be determined at trial;

6.      compensatory damages for pre and post-judgment interest, attorneys' fees and costs, as determined by this Court;

7.      such other relief as this Court deems just and proper.


_Robert L. Hickok (PA 30101)_
Alexander L. Harris (PA 311382)
PEPPER HAMILTON LLP
Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pa. 19103
t: (215) 981-4000
f: (215) 981-1750
hickokr@pepperlaw.com
harrisa@pepperlaw.com

Dated:  September 7, 2017                    *Attorneys for Plaintiff CertainTeed Corporation*

# EXHIBIT A

PURCHASE AGREEMENT

This PURCHASE AGREEMENT (the "Agreement"), dated as of May 10, 2004 , is between H. Muehlstein & Co., Inc. a New York corporation with offices at 800 Connecticut Avenue, Norwalk, Connecticut 06854 ("Supplier"), and the Siding Products Group of CertainTeed Corporation, a Delaware corporation with offices at 750 E. Swedesford Road, Valley Forge, PA 19482 ("Buyer").

<u>Background</u>

Supplier desires to sell the products listed on Exhibit A attached hereto and made part hereof (collectively, the "Products") to Buyer and Buyer desires to purchase the Products from Supplier for use in its manufacturing process on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual representations and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.   <u>Purchase and Sale of the Products.</u>

   1.1   <u>Purchase and Sale of the Products.</u>

      1.1.1.   During the Term (as defined in Section 3), and subject to the terms and conditions of this Agreement, Buyer shall designate Supplier as its primary supplier of the Products.

      1.1.2.   At all times, Supplier shall keep in its inventory sufficient quantities of Products to meet Buyer's demand for the next ▮▮▮▮▮▮ days as reflected on Buyer's forecasts provided to Supplier pursuant to Section 1.2 below (▮▮▮▮▮▮ Amount"). Notwithstanding anything contained in Section 1.1.1 and 1.1.2, subject to successful material qualification, while Buyer's estimated annual requirement is ▮▮▮▮▮▮▮ of Products, nothing in this Agreement shall be construed to require Buyer to purchase any minimum amount of the Products.

      1.1.3   From time to time during the Term, Buyer shall submit purchase orders for the Products ("Buyer's Purchase Order") to Supplier.  The purchases of the Products set forth on Buyer's Purchase Order shall be made pursuant to the terms and conditions set forth therein (Exhibit B), if the Buyer's Purchase Order Terms and Conditions including special instructions are in conflict with the terms of this Purchase Agreement, the terms of this Purchase Agreement will govern.

      1.1.4   All of the Products sold to Buyer hereunder shall be manufactured in accordance with the specifications for such Products set forth on Exhibit A or such other specifications as may be agreed upon in writing by the parties, including in each case without limitation any approved

1

formulation (the "Specifications"). The Supplier will not change an approved formulation without prior written acceptance and authorization from the Buyer.

1.1.5 

1.1.6 Time is of the essence with respect to Buyer's Purchase Orders. Delivery will be made as specified on the face of Buyer's Purchase Orders. Buyer reserves the right to reject goods and to cancel all or any portion of Buyer's Purchase Order in the event of failure to deliver at the time and place specified, in accordance with the provisions of this Agreement. Buyer's acceptance of any part of a shipment not delivered as specified on Buyer's Purchase Order shall not obligate Buyer to accept the remainder of that shipment or any future shipments. All Products shall be received subject to Buyer's inspection and acceptance; and be subject to Buyer's right to reject and return, at Supplier's expense, Product that fails to conform strictly to the specifications and Buyer's Purchase Order. Supplier shall provide Material Safety Data Sheets to Buyer prior to delivery of any product under this Agreement.

1.2 **Forecasts.** At least ▮▮▮▮▮▮▮ days before the commencement of each calendar quarter during the Term, Buyer shall provide Supplier with written forecasts of Buyer's anticipated need for the Products for such quarter and for each of the three months during such quarter. Such forecasts shall not be binding on Buyer as to the timing and quantities of Products to be ordered and paid for hereunder. Buyer shall be bound only upon the issuance of Buyer's Purchase Orders, which are subject to delivery rescheduling at any time as required by Buyer upon written notice to Supplier.

2. **Prices, Delivery and Payment**

2.1 **Prices; Taxes.** The initial prices of the Products are listed on **Exhibit C** attached hereto and made a part hereof (FOB Buyer's plant to which the Products are delivered). The purchase prices described therein are exclusive of applicable state sales and excise taxes (which should be invoiced separately by Supplier), but inclusive of freight charges and all other taxes, duties and assessments imposed or levied upon the Products supplied hereunder by any federal, state, municipal or other governmental authority in connection with the sales thereof to Buyer. Supplier shall be responsible for paying all sales and excise taxes collected from Buyer hereunder.

2

2.2     **Price Adjustment.**  The prices for the Products during the Term shall be subject to adjustment only as follows:

2.2.1 

2.2.2

    2.2.2.1

    2.2.2.2

2.2.3

3

2.2.4



2.3   <u>Delivery; Supplier's Arrangement of Freight.</u>

2.3.1   All deliveries of Products are FOB Buyer's plant or a Buyer identified contract molding plant (an "Identified Plant") to which the Products are delivered. Unless buyer specifies otherwise on its purchase order, Supplier is solely responsible for payment of all freight costs. Buyer shall promptly report to Supplier any incidents of loss or damage to the Products in transit, and Supplier shall file, an appropriate claim for such loss or damage with the carrier. Any product deemed unusable due to freight damage or contamination shall not be accepted by Buyer or invoiced by Supplier to Buyer. Current identified shipping points are (1)

2.3.2   Risk of loss shall transfer to Buyer at the time and place of delivery. In all events, risk of loss prior to actual receipt of the Products by Buyer shall remain with Supplier.

2.3.3   Two copies of Supplier's Invoice as well as an original Certificate of Analysis and a Bill of Lading, properly signed by the Supplier's authorized agent, shall be forwarded to Buyer's plant personnel no later than one week after shipments are made. Individual Invoices shall be issued for each separate shipment under this Agreement. All invoices, Certificates of Conformance and Bills of Lading shall clearly reference

4

Buyer's Purchase Order number.  Partial shipments must be identified as such on the shipping memoranda and invoices.

2.4   **Invoicing and Payment.**  Supplier shall invoice Buyer at Buyer's Accounts Payable Address set forth below or at an Identified Plant on the date such plants receive shipments defined as the tapping of the railcar, or receipt of bulk truck or gaylord delivery. ██████████████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**Accounts Payable Address:**
CertainTeed Corporation
SPG Molded Products
0352/105502
P.O. Box 6101
Southeastern, PA 19398

3.   **Term.**  This Agreement shall commence as of May 10, 2004 and, unless terminated earlier in accordance with the provisions of Section 6 hereof, shall remain in effect for a three-year period (the "Term") ending on May 31, 2007; provided, however, that  Buyer shall have the option to extend the Term for additional successive one-year periods by giving at least 120 days prior written notice of such extension to Supplier prior to the end of the then-current period.  Any such renewal shall be on the same terms and conditions as are in effect at the time of the renewal. ████████████████████
███████████████████████████████████████████████████████████████

4.   **Warranties, Indemnities and Quality of Products.**

4.1   **Specifications.**  Supplier shall manufacture the Products in accordance with the Specifications set forth on **Exhibit A** or any replacement specifications agreed to in writing by Supplier and Buyer.  Supplier will not change the approved formulation of the Products without prior written acceptance and authorization of the Buyer.

4.2   **Warranties.**  With respect to the Products delivered hereunder, Supplier warrants to Buyer that:

4.2.1   it shall have good title to the Products at the time of delivery hereunder;

4.2.2   the Products sold under this Agreement shall conform to the Specifications and be free from defects in material and workmanship; and

5

4.2.3   the Products will not infringe any patent, copyright, trademark or other intellectual property right of any third party.

### 4.3   Remedies.

4.3.1   In the event Supplier breaches the warranty contained in Section 4.2.1 above, Supplier shall, at Buyer's option, refund the purchase price for the Products or replace the Products with Products to which it has good title at no expense to Buyer.

4.3.2   In the event Supplier breaches the warranty contained in Section 4.2.2 above, Supplier shall, at Buyer's option, either refund the purchase price for the Products or, at its sole cost and expense, replace the non-conforming Products with conforming Products and reimburse Buyer for all of the following, if and to the extent incurred by Buyer: (i) Buyer's costs to remove non-conforming Products from Buyer's plant; (ii) Buyer's time and material costs in producing Buyer's products which contain non-conforming products; (iii) Buyer's costs in disposing of the non-conforming Products; and (iv) Buyer's actual costs in settling the portion of any warranty claim with respect to Buyer's products which is attributable to the non-conformity of the Products.

4.3.3   In the event of Supplier's breach of the warranty contained in Section 4.2.3 above, Supplier shall, at Buyer's option, indemnify Buyer for Buyer's out-of-pocket costs (including reasonable attorney's fees) attributable to the alleged infringement by the Products, and at its expense, (i) procure for Buyer the right to continue using the Products; (ii) replace the infringing Products with equivalent Products which meet the Specifications, including without limitation any approved formulations, but do not infringe; or (iii) modify the Products so they become non-infringing.

4.3.4   Buyer's failure to inspect or discover a non-conformity shall not be deemed to be a waiver of Buyer's rights under Sections 4.2, 4.3, and 4.4 hereof.

### 4.4   Indemnity for Products Liability.

4.4.1   Supplier agrees to indemnify, defend and hold harmless Buyer, its affiliates, and their respective directors, officers and employees (collectively, "Buyer Indemnified Parties"), from and against any claim, cause of action, loss, liability, damage, cost or expense (including, but not limited to, reasonable attorney's fees) (collectively "Losses"), resulting from or incident to any products liability claim relating to the Products before they are incorporated into Buyer's products or at any time if the Products do not meet the Specifications, whether such claim is based upon strict liability, negligence, warranty or other theory.  All rights of Buyer Indemnifies Parties to indemnification, and Supplier's indemnification

6

obligations, hereunder shall survive any expiration or termination of this agreement.

4.4.2   Buyer agrees to indemnify, defend and hold harmless Supplier, its affiliates, and their respective directors, officers and employees (collectively, "Supplier Indemnified Parties"), from and against any Losses, resulting from or incident to any products liability claim relating to products manufactured by Buyer using the Products, whether such claim is based upon strict liability, negligence, warranty or other theory provided however, that the Products used in such Buyer products meet the Specifications, including without limitation any approved formulations. All rights of Supplier Indemnified Parties to indemnification, and Buyer's indemnification obligations, hereunder shall survive any expiration or termination of this Agreement.

4.5   <u>Quality Control.</u>  Supplier will perform the quality control tests described in the Specifications and such other quality control tests as are currently or become during the Term (a) routinely used by Supplier in its plants to assure quality control; and/or (b ) recognized by the industry as being standard quality-control tests.  Buyer shall have the right to have a representative present at any quality control testing performed at Supplier's plants, and Supplier shall notify Buyer of its schedule for such testing; provided, however, that Buyer's failure to have a representative present at such testing shall not affect any claim Buyer may have for breach of warranty hereunder.  A Certificate of Analysis, in a form specified by Buyer, shall be issued by Supplier with each lot of material (generally 180,000 pounds) and provided to Buyer prior to Buyer's receipt of the Products.

5.   <u>Confidentiality.</u>  In the course of the performance of this Agreement, a party (the "receiving party") may be given, or otherwise have access to, certain trade secrets and other proprietary or confidential information ("Confidential Information") belonging to or in the possession of the other party (the "disclosing party").  The receiving party shall not disclose any Confidential Information  of the disclosing party to any third party (other than the receiving party's employees, affiliates, agents or representatives who have a "need to know" such information for purposes of this Agreement) without the disclosing party's prior written consent.  The business terms of this Agreement shall be deemed to be "Confidential Information" belonging to both parties.  "Confidential Information" shall not include the following information:

(i)     information that is or becomes generally available to the public other than as a result of a breach of this Agreement by the receiving party, or its affiliates or representatives.

(ii)    is known to the receiving party or any of its affiliates or representatives at the time of disclosure and is not subject to a non-disclosure agreement with the disclosing party of which the receiving party is aware;

7

(iii)   was received by the receiving party or any of its affiliates or representatives after the time of disclosure hereunder on a non-confidential basis from a third party who the receiving party reasonably believed had a legal right to make such disclosure;

(iv)   is subsequently developed by the receiving party or any of its affiliates without the use of such Confidential Information; or

(v)   is required by law to be disclosed by the receiving party (in the opinion of the receiving party's counsel).

The receiving party agrees to be liable for any breach of this confidentiality obligation by its employees, affiliates, agents or representatives and agrees further that the disclosing party shall be entitled to seek equitable relief, including injunctive relief and specific performance, in addition to all other remedies available to it, in the event of any breach of this provision. The rights and obligations of the parties under this Section 5 shall survive any expiration or termination of this Agreement for a period of three years.

6.   **Competitive Offer.**



7.   **Term; Termination.**

7.1   **Early Termination.** Prior to the expiration of the Term, this Agreement may be terminated as follows:

8

7.1.1   by either Supplier or Buyer, immediately, if the other party is declared insolvent or bankrupt or files a petition in bankruptcy or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy, or similar official shall be appointed to take charge of all or any part of the other party's property by a court of competent jurisdiction;

7.1.2   by either Supplier or Buyer, on 30 days written notice if the other party is in default of any other material term or condition of this Agreement and, upon receipt of such notice from the non-defaulting party, does not cure such default within such 30-day period;

7.1.3   by Buyer on 30 days written notice if any shipment of Products is defective or fails to conform to the Specifications, including without limitation any approved formulations, and such shipment is not replaced within such period with conforming and non-defective Product;

7.1.4   by mutual agreement of Supplier and Buyer;

7.1.5   by either party on 180 days written notice if the parties cannot agree to a price adjustment pursuant to Section 2.2.4; or

7.1.6   by Buyer pursuant to Section 6 hereof if Supplier fails to meet a competitor's price.

7.1.7   by Buyer if Seller fails to meet the Buyer's quality and delivery requirements.

7.2   **Effect of Termination.**  If this Agreement is terminated prior to the end of the Term by Supplier pursuant to Section 7.1.1 or 7.1.2, or by Buyer pursuant to Sections 7.1.5, 7.1.6, or 7.1.7, then Buyer shall purchase the Forty-five (45) Day Amount at the then-current prices set pursuant to this Agreement.  Except as explicitly provided in the preceding sentence, upon termination of this Agreement for any reason (including without limitation, its expiration according to the terms hereof), neither party shall be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or commitments made by such party in connection with this Agreement or otherwise in connection with its business. The expiration or termination of this Agreement shall not affect the parties' rights and obligations with respect to Product delivered, or other actions taken, hereunder prior to termination, nor shall it, in the case of a termination under Sections 7.1.2. 7.1.3 or 7.1.7, be in lieu of or constitute a waiver of any other rights or remedies, either at law or in equity, of the non-defaulting party.

8.   **Force Majeure.**  Neither party shall be liable for failure or delay in the performance of its obligations under this Agreement to the extent such failure is a result of circumstances beyond its reasonable control, including but not limited to, fire, flood or other casualty or Act of God, strikes or other labor trouble, war (declared or undeclared), embargoes, blockades, legal restrictions, riots, insurrections or governmental regulations ("Force

9

Majeure"). In the event either party is unable to carry out its obligations under this Agreement because of a force majeure situation, such party shall give notice thereof, including the full particulars of the situation and the expected duration thereof, to the other party not later than 10 days after the occurrence of the situation. Upon the giving of such notice, the obligations of the party giving such notice, to the extent they are affected by such force majeure, shall be suspended during the continuance thereof, but for no longer, and such cause shall, to the extent possible, be remedied with all reasonable dispatch; provided that neither party shall be required to resolve any strike, lockout or other labor problem in a manner that it determines is not proper or advisable. Upon the cessation of the force majeure situation, full performance hereunder shall be immediately resumed. No delay under this Section 8 shall operate to extend the term of this Agreement.

9.  **Disaster Recovery.**
    Notwithstanding Section 8, in recognition that Buyer has designated Supplier as its primary supplier of the Products, Supplier will establish a Disaster Recovery Plan acceptable to Buyer to ensure that continuity of supply can reasonably be expected to continue to meet the requirements of Buyer in the event of a catastrophic failure or other unplanned event that may occur at the Houston Facility supplying the Identified Plants. It is the intent of this Disaster Recovery plan to mitigate the effects of Section 8. Qualification of this disaster recovery plan shall be completed by 2nd quarter 2004.

10. **Resolution of Disputes.**  Any dispute or claim under this Agreement shall first be submitted to mediation in accordance with the mediation rules of the American Arbitration Association, and such mediation shall take place in Philadelphia, Pennsylvania. With respect to disputes or claims as to the ownership of patentable inventions developed hereunder, the mediator shall be an independent expert in the field of patent law. Any mediation fees shall be shared equally by the parties; however, each party shall be responsible for the cost of its own efforts, personnel, counsel and experts in preparing for and presenting its case before such mediator. Any such dispute or claim not resolved through such mediation shall be decided exclusively in the courts of the Commonwealth of Pennsylvania having jurisdiction thereof, including as may be appropriate, the federal district courts sitting in Pennsylvania, and each party hereto hereby consents to the jurisdiction of such courts.

11. **Miscellaneous.**

    11.1  **No Agency or Partnership.**  Nothing in this Agreement shall be deemed to establish a partnership or joint venture between the parties. In addition, neither party shall have the power to bind, or incur any obligations, contractual or otherwise, or make any representations or warranties, for or in the name of, the other party. Each party shall be liable to the other for, and shall indemnify, defend and hold the other harmless from and against, any Losses (as defined in Section 4.4) incurred by such other party as a result of any such representations, warranties or obligations.

    11.2  **Notices.**  All notices or communications required or permitted under this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, or by telecopier or recognized overnight

carrier, to the intended recipient at the address and attention designated on the signature page hereof or to such other address or attention as the recipient may have designated in a writing given pursuant to this Section. Any such notice or communications shall be deemed deliverable as follows: if hand delivered, on the day so delivered; if mailed, three business days after the date so mailed; if telecopied, upon telephone confirmation of receipt; and if sent by recognized overnight carrier, the next business day.

11.3    **Binding Effect; Assignment.** This Agreement shall inure to the benefit of, and be binding upon and enforceable by, the parties hereto and their respective successors and permitted assigns. This Agreement shall not be assignable by either party without the prior written consent of the other party, except that Buyer shall have the right to assign this Agreement and its rights and duties hereunder to any of its affiliates. Except as expressly permitted herein, any purported assignment made without such consent shall be null and void.

11.4    **No Third Party Beneficial Rights.** Except as expressly provided herein, nothing in this Agreement is intended to create, or shall be construed as creating, any rights in any third party.

11.5    **No Waiver of Defaults.** No failure by any party at any time, or from time to time, to enforce any of the terms or conditions of this Agreement shall constitute a waiver thereof or shall in any way impair such party's right at any time to avail itself of such remedies as it may have to enforce such terms or conditions. No waiver by any party hereunder will be effective unless in writing and signed by such party.

11.6    **Headings.** The headings used in this Agreement are for convenience only and shall not be deemed to constitute a part of, or be used in the interpretation of, this Agreement.

11.7    **Severability.** Any provision of this Agreement that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability and reformed so as to be enforceable to the maximum extent permitted by law, without invalidating the remaining provisions of this Agreement, and any such unenforceability in any jurisdiction shall not render unenforceable such provision in any other jurisdiction.

11.8    **Entire Agreement; Amendment.** This Agreement contains the entire agreement between the parties and supersedes all prior agreements, understandings and representations, whether written or oral, regarding the subject matter hereof. This Agreement may not be amended, modified or rescinded in any respect except by the prior written agreement of both parties. The terms of this Agreement shall supersede the terms of any purchase order, acknowledgment, invoice or other document used by Buyer or Supplier in the purchase or sale of the Products hereunder.

11.9   Governing Law.   THIS AGREEMENT, AND THE RIGHTS AND
LIABILITIES OF THE PARTIES HEREUNDER, SHALL BE GOVERNED
BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE
LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT
GIVING EFFECT TO ITS PRINCIPLES OF CONFLICT OF LAWS.

11.10   Laws and Regulations.   All Products and Services rendered pursuant to this
Agreement and Buyer's subsequent Purchase Orders shall be produced, sold,
delivered, or rendered to Buyer in compliance with all applicable laws and
regulations, including without limitation, the Federal Fair Labor Standards Act
of 1938, as amended;  Title VII of the Civil Rights Standards Act of 1964, as
amended; the Age Discrimination in Employment Act of 1967; Section 503 of
the Rehabilitation Act of 1970 (in the event of a conflict between the
requirements of the Occupational Safety Act of 1972 and any industry codes or
standards applicable to these transactions, the same stringent requirements shall
apply); the Noise Control Act of 1972; as well as all applicable environmental
laws and regulations, including without limitation, the Solid Waste Disposal
Act, as amended by the Resource Conversation and Recovery Act of 1976; and
the standards of accessibility set forth in Section 402 of the Americans with
Disabilities Act, and the rules, regulations and orders pertaining to the above.
Supplier agrees that the Equal Employment Opportunity clause; the
Certification of Nonsegregated Facilities, as required by paragraph seven (7) of
Executive Order 11246; the Utilization of Minority Business Enterprises and the
Minority Business Enterprises Subcontracting program clauses, the Affirmative
Action for Disabled Veterans and Veterans of the Vietnam Era clause are, by
this reference, incorporated herein and made a part hereof.

11.11   Counterparts.   This Agreement may be executed in two or more counterparts,
each of which shall be deemed an original, and all of which, taken together,
shall constitute one and the same document.  This Agreement shall become
binding only when each party hereto has executed and delivered to the others
one or more such counterparts.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date
first written above.

SUPPLIER:                                BUYER:
H. MUEHLSTEIN & CO., INC.                CERTAINTEED CORPORATION
800 Connecticut Avenue
Norwalk, CT 06854

By: _____           By: _____   _____
Name:  Billy Hayes                       Name:  Matt Kajfez
Title:  General Manager, Compounding     Title:  Global Category Manager - Specialty Chemicals,
                                                 Compagnie de Saint-Gobain

Telecopier No.: (713) 433-9783           Telecopier No.: (330) 562-3895
Telephone No: (713)-433-5604             Telephone No: (330) 562-3933

12

## EXHIBIT A

## PRODUCTS AND SPECIFICATIONS

### Compounded Polypropylene

All formulations must include a minimum of 0.75% CIBIA FS811 UV Stabilization Package or a CertainTeed approved alternative.

| Product #1 – Mineral Filled Natural Polypropylene Compound Product #60225-0000 | | |
|---|---|---|
| Pellet Size | Pellets/g | 48 – 52 |
| Melt Flow Rate | D1238 230° F/2.16kg | 60 - 75 g/10 min |
| Specific Gravity | D791 | 1.02 - 1.06 g/cm3 |
| Ash | D2584 @ 550° C | 19 - 22% |
| Weatherability | Must meet SAE J1960 Delta E<3.0 after 7500 kJ/m$^2$ exposure. No microcracking/crazing@50X | |
| Tensile Strength | D638, 2"/min. Type 1 | 2,800 psi min |
| Tensile Modulus | D638, 2"/min. Type 1 | 180,000 psi min |
| Notched Izod Impact | D256 | 0.6 ft-lbs/in min |
| Flexural Modulus | D790 | 180,000 psi min |
| Coefficient of Expansion | D696 | 5.0x10$^{-5}$ in/in/°F max |
| Deflection Temperature | D648 @ 66 psi | 135° F min |
| | D648 @ 264 psi | 205° F min |
| Rate of Burn | D635 | 2.0 in/min max |
| Smoke Density | D2843 | 40 max |
| Self-Ignition Temperature | D1929 | 650° F min |
| Bulk Density | D1895 | 37 - 39 lb/ft$^3$ |
| Gardner Impact | D-5420, GB, 23°, 1.8" | 90 in-lb |
| Color | Cielab D65, 10° Observer | |
| | L = 87.49 | 86.29 - 88.69 |
| | a = -0.19 | -0.69 - 0.31 |
| | b = 2.79 | 1.79 - 3.79 |

| Product: Mineral filled Colonial White Polypropylene Compound | | |
| --- | --- | --- |
| Product: 8522-1025 | | |
| Pellet Size | Pellets/g | 48 - 52 |
| Melt Flow Rate | D1238 230° F/2.16kg | 60 - 75 g/10 min |
| Specific Gravity | D791 | 1.02 - 1.06 g/cm3 |
| Ash | D2584 @ 550° C | 19 - 22% |
| Weatherability | Must meet SAE J1960 Delta E<3.0 after 7500 kJ/m$^2$ exposure. No microcracking/crazing@50X | |
| Tensile Strength | D638, 2"/min. Type 1 | 2,800 psi min |
| Tensile Modulus | D638, 2"/min. Type 1 | 180,000 psi min |
| Notched Izod Impact | D256 | 0.6 ft-lbs/in min |
| Flexural Modulus | D790 | 180,000 psi min |
| Coefficient of Expansion | D696 | $5.0x10^{-5}$ in/in/°F max |
| Deflection Temperature | D648 @ 66 psi | 135° F min |
| | D648 @ 264 psi | 205° F min |
| Rate of Burn | D635 | 2.0 in/min max |
| Smoke Density | D2843 | 40 max |
| Self-Ignition Temperature | D1929 | 650° F min |
| Bulk Density | D1895 | 37 - 39 lb/ft$^3$ |
| Gardner Impact | D-5420, GB, 23°, 1.8" | 90 in-lb |
| Color | Cielab D65, 10° Observer | |
| | L = 96.97 | 96.67 - 97.27 |
| | a = -0.69 | -0.49 - -0.89 |
| | b = 1.77 | 1.27 - 1.97 |

14

| Product 4 - Mineral Filled w/ Green Polypropylene Compound Product # 8322-7029 | | |
|---|---|---|
| Pellet Size | Pellets/g | 48 - 52 |
| Melt Flow Rate | D1238 230° F/2.16kg | 60 - 75 g/10 min |
| Specific Gravity | D791 | 1.02 - 1.06 g/cm3 |
| Ash | D2584 @ 550° C | 19 - 22% |
| Weatherability | Must meet SAE J1960 Delta E<3.0 after 7500 kJ/m² exposure. No microcracking/crazing@50X | |
| Tensile Strength | D638, 2"/min. Type 1 | 2,800 psi min |
| Tensile Modulus | D638, 2"/min. Type 1 | 180,000 psi min |
| Notched Izod Impact | D256 | 0.6 ft-lbs/in min |
| Flexural Modulus | D790 | 180,000 psi min |
| Coefficient of Expansion | D696 | $5.0 \times 10^{-5}$ in/in/°F max |
| Deflection Temperature | D648 @ 66 psi | 135° F min |
|  | D648 @ 264 psi | 205° F min |
| Rate of Burn | D635 | 2.0 in/min max |
| Smoke Density | D2843 | 40 max |
| Self-Ignition Temperature | D1929 | 650° F min |
| Bulk Density | D1895 | 37 - 39 lb/ft³ |
| Gardner Impact | D-5420, GB, 23°, 1.6" | 90 in-lb |
| Color | Cielab D65, 10° Observer | |
|  | L = 47.77 | 47.47 - 48.07 |
|  | a = -7.52 | -7.32 - -7.72 |
|  | b = -0.59 | -0.39 - -0.79 |

15

| Product 4 - Mineral Filled Sterling Gray Polypropylene Compound Product #3323-2045 | | |
|---|---|---|
| Pellet Size | Pellets/g | 48 - 52 |
| Melt Flow Rate | D1238 230° F/2.16kg | 60 - 75 g/10 min |
| Specific Gravity | D791 | 1.02 - 1.06 g/cm3 |
| Ash | D2584 @ 550° C | 19 - 22% |
| Weatherability | Must meet SAE J1960 Delta E<3.0 after 7500 kJ/m² exposure. No microcracking/crazing@50X | |
| Tensile Strength | D638, 2"/min. Type 1 | 2,800 psi min |
| Tensile Modulus | D638, 2"/min. Type 1 | 180,000 psi min |
| Notched Izod Impact | D256 | 0.6 ft-lbs/in min |
| Flexural Modulus | D790 | 180,000 psi min |
| Coefficient of Expansion | D696 | $5.0 \times 10^{-5}$ in/in/°F max |
| Deflection Temperature | D648 @ 66 psi | 135° F min |
| | D648 @ 264 psi | 205° F min |
| Rate of Burn | D635 | 2.0 in/min max |
| Smoke Density | D2843 | 40 max |
| Self-Ignition Temperature | D1929 | 650° F min |
| Bulk Density | D1895 | 37 - 39 lb/ft³ |
| Gardner Impact | D-5420, GB, 23°, 1.8" | 90 in-lb |
| Color | Cielab D65, 10° Observer | |
| | L = 74.65 | 74.35 - 74.95 |
| | a = -0.53 | -0.33 - -0.73 |
| | b = 0.87 | 0.67 - 1.07 |

16

## EXHIBIT B
## PURCHASE ORDER TERMS AND CONDITIONS

1. <u>Terms</u>. The terms and conditions of this Purchase Order, including those on the face hereof and those set forth below and in the Supplemental Terms and Conditions attached hereto, if any, represent the entire agreement between Seller and Buyer. Acceptance is limited to the terms and conditions of this Purchase Order, and no purported revisions of, additions to, or deletions from this Purchase Order shall be effective, whether in Seller's proposal, invoice, acknowledgment or otherwise, and no local, general or trade custom or usage, shall be deemed to effect any variation herein unless expressly agreed to in writing by Buyer's authorized representative. The delivery of any goods or the furnishing of any services pursuant to this Purchase Order shall constitute acceptance by Seller of this Purchase Order subject to, and in strict accordance with, all of its terms and conditions. To the extent that terms appearing on the face of this Purchase Order are inconsistent with those set forth herein, the terms on the face shall govern. Any reference on the face of this Purchase Order to Seller's proposal shall be exclusive of any terms and conditions attached to or referred to therein.

2. <u>Specifications</u>. All goods and services furnished pursuant to this Purchase Order shall strictly conform to the specifications, descriptions and warranties set forth in this Purchase Order. No change in this Purchase Order shall be made except upon written application to, and subsequent written authority of, Buyer.

3. <u>Time and Place of Delivery; Buyer's Inspection; Acceptance</u>. Time is of the essence of this Purchase Order. Delivery will be made as specified on the face of this Purchase Order. Buyer reserves the right to reject goods and to cancel all or any portion of this Purchase Order in the event of failure to deliver at the time and place specified. Buyer's acceptance of any part of a shipment not delivered as specified herein shall not obligate Buyer to accept the remainder of that shipment or any future shipments. If Seller is required to provide Material Safety Data Sheets, they will be delivered to Buyer prior to delivery of any goods under this Purchase Order. All goods shall be received subject to Buyer's inspection and acceptance, and subject to Buyer's right to reject and return at Seller's expense goods which fail to conform strictly to the requirements of this Purchase Order. All materials are subject to inspection and testing by Buyer at manufacturer's plant.

4. <u>Extension of Time of Delivery</u>. Buyer shall not be liable to Seller for any failure of Buyer to take any delivery hereunder when due, if occasioned by any event beyond Buyer's reasonable control, including without limitation fire, flood, earthquake, lightning or other acts of God; acts of, or compliance with the directions of, civil or military authority, including any federal, state or local agency or authority; wars; riots; insurrections; sabotage; accident; embargo; strike or other labor trouble; interruption of or delay in transportation; shortage or failure of supply of materials; or equipment breakdown. At Buyer's option, the time for delivery hereunder shall be extended to the extent of the delay occasioned by any such circumstance and the deliveries so omitted shall be made during the period of such extension.

5. <u>Risk of Loss</u>. Risk of loss of any goods sold hereunder shall transfer to Buyer at the time and place of delivery; provided that risk of loss prior to actual receipt of the goods by Buyer shall nonetheless remain with Seller.

6. <u>Shipment</u>. Goods must be shipped by the particular route, method and carrier as stated in this Purchase Order. In the event that Seller fails to ship goods on or before any scheduled shipping date, Buyer shall have the right to specify a more rapid method of shipment than was specified originally and Seller shall bear, at no additional cost to Buyer, any increased costs occasioned thereby.

7. <u>Packing, Marking, and Invoicing</u>. A packing list shall be included with each shipment. Two copies of Seller's invoices, together with original bills of lading, properly signed by carrier's representative, shall be forwarded to Buyer not later than the day after shipments are made. Individual invoices shall be issued

17

for each separate shipment. Buyer shall not be charged for packaging, boxing, crating or cartage. All invoices, packing lists, bills of lading, and each separate package within each shipment shall clearly reference piece number, Buyer's Purchase Order number and Seller's packing slip number. Partial shipments must be identified as such on the shipping memoranda and invoices.

8. **Payment; Waiver of Liens.** Payment will be made following receipt and acceptance of the goods and receipt, in proper form and substance, of all documentation required by this Purchase Order. Seller shall furnish to Buyer any analysis or breakdown of the price as Buyer may reasonably request. This Purchase Order shall not be filled at prices higher than last quoted or charged by Seller, except as expressly agreed by Buyer. As a condition to any payment hereunder, Seller shall furnish to Buyer, upon request, an executed waiver of liens and claims in form reasonably satisfactory to Buyer. Seller agrees to indemnify, defend and hold harmless Buyer from and against any and all liens and enoumbrances arising out of Seller's performance of this Purohase Order or rising out of any claim for payment by any laborer, subcontractor or supplier of Seller.

9. **Seller's Warranties.** Seller expressly warrants that for a period of one year after Buyer's acceptance of the goods or services hereunder, or for such longer period as may be expressly provided in this Purchase Order or under applicable law, all goods and services covered by this Purchase Order will: (a) strictly conform to Seller's specifications, drawings, samples and other written materials and descriptions, or, to the extent the goods were purchased to Buyer's specifications and drawings as set forth or referred to in this Purchase Order, that the goods strictly conform with those specifications and drawings; (b) be free from defects in design, material and workmanship; (c) be of merchantable quality and suitable for the particular purposes intended, whether express or reasonably implied; and (d) bear all warnings, labels, and markings required by applicable laws and regulations. In addition, Seller warrants that: (e) none of the goods covered hereby, to the extent they are subject to laws prohibiting adulteration or misbranding, is adulterated or misbranded within the meaning of such laws as of the date of delivery to Buyer; (f) all goods covered hereby may be introduced into interstate commerce without violation of applicable laws and regulations; (g) all services have been performed in a good and workmanlike manner; and (h) all goods and services furnished or rendered pursuant to this Purchase Order have been produced, sold, delivered or rendered to Buyer in compliance with all applicable laws and regulations, including those set forth in Section 14.

10. **Buyer's Remedies.** Buyer's acceptance of all or any part of the goods or services provided hereunder shall not be deemed a waiver of the failure of such goods or services to conform to all of the warranties set forth in Section 9. Buyer retains the right to cancel any portion of the remaining order, to reject any portion of the goods or services delivered, or to revoke acceptance as to any portion of the goods or services accepted, and return such goods to Seller and to recover the purchase price, any excess costs of cover, and damages, including manufacturing costs, costs of removal or recall, transportation and custodial expenses, injury to person or property incurred by Buyer, all in addition to Buyer's other remedies under this Purchase Order or applicable law. If Seller becomes insolvent or makes an assignment for the benefit of creditors, or files or has filed against it any petition in bankruptcy, Buyer shall have the right to cancel this Purchase Order immediately.

11. **Patent, Copyrights, Trademarks.** Seller warrants that the goods furnished under or used in connection with this Purchase Order (except those furnished according to Buyer's specific design) and Buyer's express or reasonably implied intended use thereof, do not and will not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third party. If any claim, suit or proceeding is made or instituted against Buyer alleging any such infringement, Seller shall indemnify, defend and hold Buyer harmless from and against any damages, liabilities, judgments, costs and expenses (including without limitation reasonable attorney's fees) it may incur in connection with any such claim, suit or proceeding. In the event that the goods or Buyer's use is held in any suit or proceeding to constitute an infringement, or if Seller determines that there is a substantial risk of a finding of such infringement, Seller agrees, as appropriate, and at its expense to:  (a) procure for Buyer, at no expense to Buyer, the right to continue using the goods, (b) replace the goods with equivalent goods that meet the

18

requirements of this Purchase Order and that do not infringe any such rights, or (c) modify the goods so that they become non-infringing.

12. **INDEMNIFICATION.** To the fullest extent permitted by law, Seller agrees to indemnify, defend, and hold harmless Buyer, its affiliates, and their respective directors, officers, employees and agents (the "Indemnified Parties") from and against all claims, demands, causes of action, losses, costs and expenses (including without limitation reasonable attorneys' fees and costs of defense) (collectively, "Losses") arising out of or incident to Seller's performance hereunder, or the presence of Seller, its employees, agents or invitees ("Seller Parties") on Buyer's premises, provided that such Losses are attributable to (a) the negligence or willful misconduct of the Seller Parties, (b) the failure of the Seller Parties to comply with applicable laws, or (c) bodily injury, sickness, disease or death (including but not limited to bodily injury, sickness, disease or death of the employees of Seller or Buyer), or to damage to or destruction of tangible property (including the loss of use thereof); in each case regardless of whether or not caused in part by the negligence or other fault of any Indemnified Party hereunder; provided that Seller shall not be liable for Losses caused by the sole negligence or willful misconduct of any Indemnified Party.

Seller's indemnification obligations under this Section 12 shall not be limited by applicable Workers' Compensation or other disability or employee benefit laws, and, solely as respects the indemnities set forth in this Section, Seller hereby expressly waives any rights it may have to assert any immunities or defenses that it may have under such laws against any Indemnified Party.

13. **Labor, Work and Services; Insurance.** In supplying any services hereunder, Seller warrants that it is, and undertakes such performance as, an independent contractor, with sole responsibility for the payment of all federal and/or state unemployment insurance, social security and/or other similar taxes incurred hereunder. Any performance by Seller under this Purchase Order on Buyer's premises shall be in full compliance with Buyer's safety and other rules and procedures and with all federal and state laws and regulations regarding workplace safety, including without limitation, laws pertaining to occupational safety and health. Prior to commencement of any services hereunder on Buyer's premises and until the satisfactory completion thereof, Seller shall, at its expense, maintain the following minimum insurance coverages on an "occurrence" basis (and not on a "claims made" basis):

| Kind of Insurance | Minimum Limits |
|---|---|
| Workers' Compensation | Statutory |
| Employer's Liability | $1,000,000 bodily injury by accident, each accident<br>$1,000,000 bodily injury<br>by disease, policy limit<br>$1,000,000 bodily injury by disease, each employee |
| Commercial General Liability, including Contractual Liability, Products/Completed Operations and Broad Form Vendor's Endorsement | Combined Single Limits:<br>$1,000,000 Occurrence<br>$1,000,000 General<br>Aggregate<br>$1,000,000 Products/ Completed Operations Aggregate |
| Business Auto Liability Symbol 1 (Any Auto) including Hired and Non-Owned Autos | Combined Single Limits:<br>$1,000,000 per accident |

Seller shall furnish to Buyer certificates of insurance showing the above coverages and providing for at least thirty (30) days prior written notice of cancellation or modification resulting in a reduction below the required minimum coverages and naming Buyer as an additional insured. If Seller fails to furnish such certificates or maintain such insurance, Buyer shall have the right to cancel this Purchase Order

19

immediately.  Seller, for itself and its insurers, hereby waives subrogation against Buyer, and Seller agrees that, with respect to claims against Buyer arising out of Seller's performance hereunder, Seller's insurance shall be primary and Buyer's insurance shall be excess.  Seller's obligations to maintain such insurance shall in no way limit the liability or obligations assumed by Seller hereunder.

14.  **Laws and Regulations**.  All goods furnished or services rendered pursuant to this Purchase Order shall be produced, sold, delivered, or rendered to Buyer in compliance with all applicable laws and regulations, including without limitation, the Federal Fair Labor Standards Act of 1938, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, Section 503 of the Rehabilitation Act of 1973, Executive Order 11246, Section 402 of the Vietnam Veterans' Readjustment Assistance Act of 1974, the Occupational Safety and Health Act of 1970, as amended ("OSHA"), (in the event of a conflict between the requirements of OSHA and any industry codes or standards applicable to this Purchase Order, the more stringent requirement shall apply), the Noise Control Act of 1972, all applicable environmental laws and regulations, including without limitation, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, and the standards of accessibility set forth in Section 402 of the Americans with Disabilities Act, and the rules, regulations and orders pertaining to the above.

Seller also agrees that the following clauses from the Code of Federal Regulations shall also apply to this Purchase Order and shall be incorporated herein by reference:  the Equal Employment Opportunity Clause, the Certification of Nonsegregated Facilities required by paragraph (7) of Executive Order 11246, the Utilization of Minority Business Enterprises and the Minority Business Enterprises Subcontracting program clauses, the Affirmative Action for Handicapped Worker's clause, and the Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era clause are, by this reference, incorporated herein and made part hereof.

15.  **Termination**.  Buyer may at any time, without cause, terminate this Purchase Order in whole or in part upon written notice to Seller.  In such event, Seller shall be entitled to a reasonable termination fee consisting of a percentage of the Purchase Order price reflecting the percentage of the work, goods delivered or services properly performed prior to termination.  Payment of such termination fee shall be Seller's sole remedy.  Upon Buyer's request, Seller shall preserve, protect and deliver to Buyer, at Buyer's expense, materials on hand, work in progress, and completed work, both in its own and in its suppliers' plants.

16.  **Assignment and Set-Off**.  Seller shall not assign its rights or delegate its performance hereunder, nor any interest herein, without Buyer's prior written consent and any attempted assignment or delegation without such consent shall be void.  Buyer shall be entitled at all times to set-off any amount owing from Seller to Buyer, whether under this Purchase Order or otherwise, against any amounts otherwise payable to Seller.

17.  **Confidentiality**.  Seller and its directors, officers, employees and agents shall not disclose to any third party any information pertaining to the goods provided or services performed hereunder, or pertaining to Buyer's business or operations which Seller obtains or has access to in connection herewith, without the prior written consent of Buyer.

18.  **No Waiver of Defaults**.  No failure by Buyer to enforce at any time any of the terms or conditions of this Purchase Order shall constitute a waiver thereof or in any way impair Buyer's right at any time to avail itself of such remedies as it may have to enforce such terms or conditions.  No waiver by Buyer hereunder will be effective unless in writing and signed by Buyer.

19.  **Survival; Remedies Cumulative**.  All agreements and representations of Seller herein (including those regarding confidentiality, indemnification and warranties) shall survive delivery and final payment hereunder, or any earlier termination hereof.  All of the rights and remedies available to Buyer hereunder are in addition to, and not in limitation of, the rights and remedies otherwise available at law or in equity.

20. <u>Severability</u>.  Any provision of this Purchase Order that is unenforceable in any jurisdiction shall be ineffective to the extent of such unenforceability (but shall be enforced to the maximum extent permissible) without invalidating the remaining provisions hereof.

21. <u>Governing Law</u>.  This Purchase Order shall be governed by the laws of the state from which Buyer issues this Purchase Order, without giving effect to its principles of conflicts of law.

1/01

## EXHIBIT  C

### PRODUCT PRICES

A.  **Price List  (Before discounts, rebates and payment terms)**

I.  Base Index Pricing for the subject Muehlstein compound **PP-8322 .** Natural:

- ●
- ●
- ●

II.  Base Index Pricing for the subject Muehlstein pre-colored Colonial White compound in **PP-8322,**

- ●
- ●
- ●

III.  Base Index Pricing for the subject Muehlstein pre-colored Sterling Gray, Ivy Green and other compound pre-color in PP-8322

- ●
- ●
- ●

IV.  Pricing subject to adjustment as defined in Section 2 of the Purchase Agreement.

V.

VI.

B.

I.

22

II.

III.

C.



D.  Consignment Agreement:
  - Muehlstein agrees to maintain [REDACTED] days of inventory staged for
    CertainTeed requirements and invoicing will occur at the point that the Rail Car is
    Tapped by CertainTeed.  Bulk Trucks and Truckload box stock will be invoiced at
    time of shipment.

23

## ADDENDUM "C" TO PURCHASE AGREEMENT

This Addendum "C" to Purchase Agreement ("Addendum C") is dated and effective as of February 1, 2010, and is made by and between H. Muehlstein & Co., Inc. a New York corporation ("Supplier"), and the Siding Products Group of CertainTeed Corporation, a Delaware corporation ("Buyer").

## RECITALS:

WHEREAS, Supplier and Buyer entered into that certain Purchase Agreement dated May 10, 2004 ("Master Agreement"), as amended by the 1/27/09 Addendum B ("Addendum B") (the Master Agreement with Addendum B, collectively, the "Agreement"), pertaining to the purchase and sale of certain plastic raw material products, all as set forth with particularity in the Agreement; and

WHEREAS, the term of the Agreement ran through December 31, 2009 and the parties have continued to honor all of the terms and conditions of the Agreement by course of dealing since that date; and

WHEREAS, Supplier and Buyer desire to enter into this Addendum C to further amend and extend the term of the Agreement, as provide for certain other maters as more fully set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree that the Agreement shall be amended in accordance with the terms and conditions set forth below.

I.  TERM.  The Term of the Agreement, as set forth in Section 3 of the Master Agreement and as amended by Section 1 of Addendum B, is hereby further amended to extend the Term through December 31, 2010.

II. PRICE ADJUSTMENT.  Section 2.2.2 of the Master Agreement, as amended by Section 2 of Addendum B is hereby replaced in its entirety as follows:

2.2.2



1

III. FREIGHT CHARGES. Pursuant to section 2.2.3 of the Master Agreement, and effective February 2, 2010, the following freight charges shall be added to the Product price:



i.
ii.
iii.

The above rates replace the rates proscribed in Section 5 of the Addendum B, and shall continue in place until next amended.

IV. PRODUCT PRICES – MASTER AGREEMENT EXHIBIT "C".



a.

b.

V. CLAIM.



VI. MISCELANOUS. With the exception of those matters set forth in this Addendum C, the rights and obligations of the parties shall be subject to all terms, covenants and conditions of the Agreement. In the event of any express conflict or inconsistency between the terms of this Addendum C and the terms of the Agreement, the terms of this Addendum C shall control and govern. Except as expressly modified by this Addendum C, all other terms and conditions of the Agreement are hereby ratified and affirmed.

2

IN WITNESS WHEREOF, the foregoing Addendum C is dated effective as of the date and year
first written above.

SUPPLIER:                                         BUYER:
H. Muehlstein & Co., Inc.                         CertainTeed Corporation

By: _____                      By: _____

Name: *Damian Mullin*                             Name: _____

Title: *Sales Director*                           Title: _____

3

## ADDENDUM "D" TO PURCHASE AGREEMENT

This Addendum "D" to Purchase Agreement ("Addendum D") is dated and effective as of January 1, 2011, and is made by and between Ravago Manufacturing Americas LLC ("Supplier"), and the Siding Products Group of CertainTeed Corporation, a Delaware corporation ("Buyer").

### RECITALS:

WHEREAS, Supplier and Buyer entered into that certain Purchase Agreement dated May 10, 2004 ("Master Agreement"), as amended by the 1/27/09 Addendum B ("Addendum B") and the 2/1/2010 Addendum C (the Master Agreement with Addendums B and C, collectively, the "Agreement"), pertaining to the purchase and sale of certain plastic raw material products, all as set forth with particularity in the Agreement; and

WHEREAS, the term of the Agreement ran through December 31, 2010 and the parties have continued to honor all of the terms and conditions of the Agreement by course of dealing since that date; and

WHEREAS, Supplier and Buyer desire to enter into this Addendum D to further amend and extend the term of the Agreement, and provide for certain other matters as more fully set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree that the Agreement shall be amended in accordance with the terms and conditions set forth below.

I. <u>TERM</u>. The Term of the Agreement is extended the Term through December 31, 2011.

II.





VI. <u>CONSIGNMENT</u>. Referencing both the Master Agreement, Section 1.2 and Exhibit C Section D, Buyer and Seller hereby agree to mutually develop a more efficient forecasting and supply chain management process that results in reducing Seller's working capital costs associated with inventorying raw materials and finished compounds at its facility, in transit and staged at Buyer's facility.

VII. <u>MISCELLANOUS.</u> With the exception of those matters set forth in this Addendum D, the rights and obligations of the parties shall be subject to all terms, covenants and conditions of the Agreement. In the event of any express conflict or inconsistency between the terms of this Addendum D and the terms of the Agreement, the terms of this Addendum D shall control and govern. Except as expressly modified by this Addendum D, all other terms and conditions of the Agreement are hereby ratified and affirmed.

IN WITNESS WHEREOF, the foregoing Addendum D is dated effective as of the date and year first written above.

SUPPLIER:
Ravago Manufacturing Americas LLC

BUYER:
CertainTeed Corporation

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

# CertainTeed



## ADDENDUM "E" TO MASTER PURCHASE AGREEMENT

This Addendum "E" to the Purchase Agreement ("Addendum E") is effective as of January 1, 2012, and is made by and between Ravago Manufacturing Americas LLC ("Supplier"), and the Siding Products Group of CertainTeed Corporation, a Delaware corporation ("Buyer").

### RECITALS

WHEREAS, Supplier and Buyer entered into that certain Purchase Agreement dated May 10, 2004 ("Master Agreement"), as amended by the 1/27/09 Addendum B, the 2/1/2010 Addendum C, and the 2/1/2011 Addendum D (the Master Agreement with Addendums B, C and D, collectively, the "Agreement"), pertaining to the purchase and sale of certain plastic raw material products, all as set forth with particularity in the Agreement; and

WHEREAS, the term of the Agreement will run through December 31, 2011 and the parties have continued to honor all of the terms and conditions of the Agreement by course of dealing since that date; and

WHEREAS, Supplier and Buyer desire to enter into this Addendum E to further amend and extend the term of the Agreement, and provide for certain other matters as more fully set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree that the Agreement shall be amended in accordance with the terms and conditions set forth below.

I. <u>TERM</u>.  The Term of the Agreement is extended through December 31, 2013.

II.



a. 

VI. <u>CONSIGNMENT</u>. Referencing both the Master Agreement, Section 1.2 and Exhibit C Section D, Buyer and Seller hereby agree to continue to find efficiencies in the forecasting / supply chain management process that results in reducing Seller's working capital costs associated with inventorying raw materials and finished compounds.

VII. <u>COST REDUCTION INITIATIVES</u>. The parties agree to expand their partnership and collaborate on the following key VA/VE initiatives with the objective of achieving cost reductions:

a. 

e.

f.

VIII. <u>MISCELLANOUS.</u> With the exception of those matters set forth in this Addendum E, the rights and obligations of the parties shall be subject to all terms, covenants and conditions of The Agreement. In the event of any express conflict or inconsistency between the terms of   this Addendum E and the terms of the Agreement, the terms of this Addendum E shall control and govern.  Except as expressly modified by this Addendum E, all other terms and conditions of the Agreement are hereby ratified and affirmed.


*******


IN WITNESS WHEREOF, the foregoing Addendum E is affirmed below on December _____, 2011.

**Ravago Manufacturing Americas LLC**             **CertainTeed Corporation**


_____             _____
Name:                                        Name:
Title:                                       Title: